UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GEORGE BUSH,

        Petitioner,

                                          CASE NO. 2:08-CV-12687

v.                                   HONORABLE VICTORIA A. ROBERTS

PATRICIA CARUSO,

        Respondent.

_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS**
**CORPUS BUT GRANTING A CERTIFICATE OF APPEALABILITY**

**I.**      **Introduction**

      Michigan probationer George Bush ("Petitioner"), through counsel, filed a petition for a

writ of habeas corpus pursuant to 28 U.S.C. §2254, challenging his 2004 Wayne County Circuit

Court conviction for releasing a harmful chemical substance (mercury) for an unlawful purpose,

Mich. Comp. Laws § 750.200i(1)(b).  He was sentenced to five years probation and restitution.

      In his pleadings, Petitioner raises claims concerning the sufficiency of the evidence, the

denial of a mistrial motion, the exclusion of certain testimony, and a limitation on the cross-

examination of a witness.

      The Court concludes that Petitioner is not entitled to federal habeas relief and denies the

petition.  However, the Court grants Petitioner a certificate of appealability on all of his habeas

claims.

**II.**      **Facts and Procedural History**

1

George Bush's conviction arises from a mercury spill that occurred on October 11, 2001 at Finney High School in Detroit, Michigan.  Petitioner, the school's chief engineer at that time, discovered the spill, most of which was found on the floor of the science wing.  The school was closed for several days while local, state, and federal agencies conducted an investigation and cleanup.

At the time of the incident, Petitioner had been employed with the Detroit Public Schools for 31 years, was certified as a first-class engineer, and oversaw a staff of boiler operators and engineers at Finney.  His base salary in 2001 was $90,000, but he made an additional $50,000 in overtime pay.  Petitioner and his staff were responsible for keeping Finney and its annex operational seven days a week.  As part of their duties, they monitored and maintained the boiler system, which provided heat and hot water to the school building and annex.  Finney had two boilers and at least one of them had to be operational for the buildings to remain open.  Petitioner and his staff also performed other maintenance tasks, such as electrical work, as needed. Petitioner and his staff were members of the Operating Engineers Union, Local 547, and were parties to a collective bargaining agreement with the Detroit Board of Education which governed employees' job classifications, assigned duties, overtime, and other conditions of employment.

The trial testimony established that the engineers and boiler operators at Finney had a large amount of overtime.  Some of the overtime was contractual and occurred during the colder months of the year.  Some of the overtime resulted from a staffing shortage.  As the chief engineer, Petitioner was responsible for assigning overtime to his staff in accordance with the collective bargaining agreement.  Overtime had to be approved by the school district.

Prior to the spill, there were two vacant positions on Finney's engineering staff.  Ron

2

Diebel was assigned to fill one vacancy, thereby reducing the amount of overtime available to other employees. Diebel's assignment at Finney caused problems among the staff because he was only classified as a boiler operator due to the Detroit Board of Education's delay in processing his promotion. He had earned his third-class engineer's license. Witnesses stated that such delays were common and employees often worked out of class and were given back pay when promotions were finalized. Nonetheless, several individuals believed that Diebel's work assignment as a third-class engineer violated the terms of the collective bargaining agreement; at least one grievance was filed with the union.

 A. <u>Prosecution Witnesses</u>

 Tammy Force, an administrative assistant with Local 547, testified that Ron Diebel called her office at about 9:00 a.m. on October 11, 2001 asking to speak to Gary Lucy or Phil Schloop. Neither was available. Petitioner then got on the phone and told her that if he did not speak to Lucy or Schloop soon, he would close down the school. He said he was having problems with his equipment and crew. Force gave Gary Lucy the message and memorialized the conversation in a memo at Phil Schloop's request. Force also testified that Petitioner called on October 17, 2001 and asked her if she had spoken to the police. He also tried to convince her that he had said he would close "the plant," not the school, during their conversation on October 11, 2001, which conflicted with her memory of the call and her written memo.

 Gary Lucy, the vice-president of Local 547, testified that he received a call from Tammy Force that Petitioner was going to shut the school down if he did not hear from her or Phil promptly. He was unable to get through to Finney, so he called Frank Vaught, a union steward, and asked him to investigate the situation. Later that afternoon, he heard on the radio that

Finney was under quarantine.  Lucy also testified that Petitioner called him on October 17, 2001 and asked if Lucy had called the police on him.  Lucy denied doing so.  Petitioner then asked if Tammy Force had called the police, and Lucy said he did not know.  Petitioner asked Lucy to call him if he heard more about the investigation or was contacted by the police.  Lucy agreed to do so.  Lucy memorialized the conversation.

Lucy testified that he was aware of the staffing and overtime issues at Finney and other schools.  He said that no other engineer had ever made $50,000 in overtime, but did not think that Petitioner was stealing it.  He explained that Petitioner was responsible for overtime assignments at Finney and the school district had implemented new overtime forms which required the signature of both the principal and chief engineer.  He also said that the district had assigned Ron Diebel to fill one of the vacancies at Finney in an effort to decrease the amount of overtime.  Lucy was aware that Petitioner's employees were aggravated by the situation because Diebel was licensed and assigned as a third-class engineering position but was only classified as a boiler operator.  He indicated, however, that it was common practice for someone with the right licensing to work out of class while awaiting a promotion.  Lucy also testified that, other than Ron Diebel, only one or two employees had complained about the fairness of those assignments.

Phil Schloop, the business manager for Local 547, also testified about the overtime and vacancies at Finney and explained how Ron Diebel was assigned to Finney to work as a third-class engineer, even though he was only classified as a boiler operator.  He testified that Diebel filed a grievance about the promotion delay and that another employee, Frank Gruenwald, filed a grievance about Diebel's assignment at Finney.  Schloop confirmed that once he learned of the

4

mercury spill, he asked Tammy Force to memorialize her phone conversation with Petitioner. He also testified that if there was a building problem at a school, the chief engineer would consult the principal and the administration about any closure.  He testified that Petitioner was one of the highest paid employees in the bargaining unit.  Schloop indicated that Petitioner was paid $140,000 in 2001 with a substantial part due to overtime.

Ron Diebel testified that he was licensed as a third-class engineer but was classified as a boiler operator and awaiting a promotion while working at Finney in 2001.  It took nearly a year for his promotion to be approved.  He admitted that he was disgruntled and angry about the delay in his promotion, but said he was not that upset with Petitioner.  Diebel testified that his co-workers did not want him working at Finney and that he had received threats to himself and his family.  He identified Frank Gruenwald and Petitioner's brother, Don Bush, as two employees who threatened him.  Diebel said that he worked the day shift as a boiler operator, and was assigned the midnight shift as an engineer a few days before the mercury spill, which meant less overtime for other employees.

On October 11, 2001, Diebel worked the early morning shift from 4:00 a.m. to 12:00 p.m.  He had no problems firing up or blowing down boiler number two.  Boiler number one was not working, but he could not recall the problem.  According to the employees' log book, boiler number two was operational.  Diebel asked to work three hours of overtime that day because two employees, Frank Gruenwald and Jim Miller, called in sick.  Darryl Settles authorized the overtime.  Diebel also called the union about his work situation that morning and spoke with Tammy Force before handing Petitioner the phone.  Diebel testified that Petitioner was angry and told her that his employees were ready to walk out.  Petitioner also threatened to close either

5

the school, the plant, or the place down, but Diebel could not recall the exact phraseology. Diebel said he was confused because Petitioner spoke to him several times after the mercury spill and insisted that he had said "plant," not "school."

Diebel testified that he was studying at his desk in the boiler room at noon on October 11, 2001. He recalled that apprentice Victoria Williamson and boiler operator Bob Cash were there and he saw both of them sometime between 12:00 and 1:00 p.m. At one point, Williamson came to get supplies. She told him that they had to clean up a mercury spill. Petitioner came into the boiler room about an hour later. Petitioner said it was unfair that his brother, Finney boiler operator Don Bush, was not allowed to work overtime but Diebel could do so. Petitioner sent Diebel home and did not let him work overtime. Diebel denied throwing any coffee cups or kicking any chairs. He said that Petitioner did not mention the mercury spill or ask him to assist. Diebel did not discover the seriousness of the spill until later that evening. Petitioner called him several times between 2:00 and 4:00 a.m. and left him a message. When Diebel spoke to Petitioner a few days later, Petitioner told him that they should stick together and asked him to share any information he received from the police.

Diebel did not see any steam fitters at Finney on October 11, 2001. He testified that he started up the fans in the school that morning, but could not recall whether he was near rooms 153, 154, and 156 or near the science lab. He said that his responsibilities were to watch the boilers and do other tasks assigned by Petitioner. Diebel confirmed that tunnels went from the boiler room area to the school and agreed that it would be possible for someone to travel between the two undetected.

Victoria Williamson testified that she was an apprentice boiler operator newly-assigned

to Finney in October, 2001 and worked the day shift from 7:00 a.m. to 3:00 p.m.  She recalled

that only one boiler was running on October 11, 2001.  She, Petitioner, Bob Cash, and Ron

Diebel were on duty and two employees were out sick that day.  From noon to 1:12 p.m. she and

Ron Diebel studied at their desks in the crew room.  Petitioner came in and told her and Bob

Cash to get supplies and come with him.  While they walked, he told them about the mercury

spill.  Williamson observed two large pools of mercury, and beading down the hallway.  She

warned Cash to be careful because mercury was dangerous.  Petitioner said it was okay; he

played with mercury when he was a kid.  Williamson also observed Petitioner kick the mercury

with his foot.

Williamson did not recall seeing steam fitters at Finney that day.  She did not see

Petitioner with any mercury that day.  Williamson testified that Petitioner called her at home the

following Monday and asked about her contact with police.  She said it was none of his business.

Edwin Sauve, a hazardous waste chemist, testified that he worked for a contractor

charged with removing hazardous waste from the public schools in 2001.  He was responsible

for packaging the chemicals and preparing paperwork.  He received an inventory list from

Finney from Phyllis King for 41 thermometers and one barometer.  The first time he went to

Finney to pick up the materials, he was unable to access the room.  The second time in July,

2001, King was not there, but Petitioner took him to the storage room to retrieve the materials.

The materials were in a locked cabinet.  Sauve testified that Petitioner popped the lock with a

long thin screwdriver or a wire.  Sauve then packaged the materials, sealed two five-gallon

containers, and prepared the paperwork.  There was no barometer in the cabinet.  When King

arrived, she asked him to ensure that no one would have access to the materials, which he picked

up a week later.

Phyllis King testified that she was the science department head and then curriculum coordinator at Finney.  One of her responsibilities in July, 2001 was to collect mercury items and have them removed from the school.  With the assistance of science teacher Fay Najor, she collected the items and prepared an inventory which listed 41 thermometers and one barometer. The barometer was described as old-fashioned, three-feet long, and made of antique wood with a graduated cylinder and glass bulb.  She estimated that the barometer contained a cup to a cup and a half of mercury.  Once collected, the items were stored in a locked cabinet in a science lab storage room.  Najor initially had the key to the cabinet, but gave it to King.  King was at home when the courier came to get the mercury items from Finney.  When King arrived, Petitioner and the courier were in the storage room.  She was angry and asked how Petitioner opened the locked cabinet.  He replied that he's an engineer and can get into anything he wants.  King recalled that a large barometer was located in Najor's classroom, but explained that it was not included on the inventory because it was mounted to a wall behind a cabinet and was not being removed.  She verbally notified the science department of this fact.

King learned of the mercury spill when she saw Petitioner and assistant principal Karen Johnson walking toward her and pointing at the floor.  She had no difficulty seeing the mercury in the science hallway.  She said it was in liquid form in puddles.  She remained in the hallway for a time to keep people out of the mercury.  After the area was cordoned off, she observed Petitioner playing with some of the mercury with his hands while sitting at a table with two other engineers.  Throughout the day, she saw beads on the floor in different areas.

James Hoelscher testified that he works for the National Enforcement Investigation

8

Center ("N.E.I.C.") of the United States Environmental Protection Agency ("E.P.A.").  On

January 23, 2002, he received a plastic bottle three-quarters full of liquid and a metal dropper

from E.P.A. Agent Doug Parker at his Michigan office.  Hoelscher placed the items in a tamper-

resistant package and sent the package via Federal Express to an E.P.A. lab in Denver, Colorado.

John Fowler testified that he is a chemist and unit leader with the N.E.I.C. in Denver

Colorado.  He confirmed that the N.E.I.C. received the package, conducted tests on the items,

and detected mercury in the bottle.  On cross-examination, Fowler admitted that he did not

personally do the testing and was not in the lab during the tests.  Rather, he was the project

reviewer.  Fowler was familiar with the testing methods and described them.  He indicated that

the woman who performed the tests was unavailable due to a medical condition.

Karen Brantley Johnson, the assistant principal at Finney, testified that she was acting

principal on October 11, 2001 because the principal, Alvin Ward, was not at the school.  She was

not told of any mechanical or boiler problems.  She first became aware of the mercury spill when

Petitioner came into her office around 12:45 p.m. and told her that they had to close the school.

The two of them went into the hallway and saw Phyllis King.  They walked to the science

hallway and Petitioner pointed out droplets of mercury on the floor.  Johnson said that she could

not see it because of poor lighting in the hallway, her glasses, and their quick pace.  She wanted

to return to the office to make an announcement for teachers to hold students in the classrooms,

but some classes started to exit.  They tried to keep students out of the mercury and she contact

administrative officials.  She did not have contact with Petitioner again until later that afternoon

and she noticed that he was wearing different clothes.  Johnson also testified that Finney had

some security cameras at that time and that the only people who were supposed to monitor them

9

were the public safety officers assigned to the school.

Fay Najor, a chemistry teacher at Finney, testified that she assisted Phyllis King in gathering the mercury-laden items at the school in 2001. She left a small barometer, which held 10 to 20 millimeters of mercury, hanging on her wall because it was affixed. She placed a cabinet in front of it so that students would not see it. The barometer was removed a few months before trial. Najor first learned of the mercury spill when King came to her classroom and told her about it. She saw Petitioner standing by a puddle of mercury and saw a large amount in front of Ryan Davis' classroom. Najor also testified that Petitioner called her on Saturday two days after the spill to ask about the barometer in her room and she told him where it was located. Najor was aware that some beads of mercury were found on a counter in the stock room where the mercury items gathered for removal had been stored. She said that she saw a few beads when she returned to school in September and brushed them aside with her hand, assuming they were from the mercury pick-up in July. Students did not have access to the stock room. She denied spilling the mercury on October 11, 2001.

Ryan Davis, a chemistry and physics teacher at Finney, testified that he did not see any mercury in the hallway when he took his attendance sheet to the office at 12:20 p.m. on October 11, 2001. When he went into the hallway at 12:55 p.m., however, he saw a mercury puddle in front of his door and more down the hall. He saw Petitioner and Phyllis King in the hallway.

Denice Nesbitt testified that she was a public safety officer at Finney in 2001. A week or two before the mercury spill, Petitioner approached her while she sat at the console for the security cameras, and asked her several questions about the console and the backup system. On another occasion, she found Petitioner standing at the console when she returned from the

10

restroom.  She told him to leave because no one was supposed to be in that area.

Nesbitt was working at Finney on October 11, 2001 and was normally on duty from 7:30 a.m. to 3:30 p.m.  While making rounds that afternoon, she and her partner saw a few teachers and a section of the hallway blocked off and they learned of the mercury spill.  She saw Petitioner and other employees staring at the floor.  Petitioner showed her where the mercury was by kicking the beads with the front of his boot.  She did not normally see Petitioner in the school hallways.  Nesbitt also testified that there were no security cameras in the science wing because the ceilings were too low and tall students would have been able to reach the cameras. Nesbitt said that the security cameras were working on October 11, 2001 but the recording device was not and the tapes were blank.  In a prior written statement, she indicated that the tapes from that day were missing.  She worked until almost midnight that day to help with screening and other activities, but did not go back to the console from 4:30 to 11:30 p.m.  Nesbitt testified that a company called Actron, not building engineers, maintained the security cameras.

Kurt Grunert, a special agent with the E.P.A., testified that he went to Finney at 8:00 p.m. on October 11, 2001.  He took 24 photographs of the science wing, an adjacent hallway, and an area near the auto shop.  He gave the photos to Agent Parker in January, 2003.

Alvin Ward, the principal at Finney, testified that there was no security camera coverage in the science wing, the adjacent hallway, or the area near the auto shop in 2001.  A week or two before the mercury spill, he asked Petitioner not to go in the security console area but caught him in that area shortly thereafter.  Ward also received a call from the head secretary stating that Petitioner was in Mr. Simms' office, where the cameras can be accessed with a joy stick.  Ward let Mr. Simms address the impropriety of Petitioner's presence in Simms' office.

11

Ward was at a workshop when the mercury spill occurred and was notified by his executive director between 12:00 and 1:00 p.m.  He returned to the school, spoke with Karen Johnson, and began dealing with the situation.  Petitioner told him that he discovered the mercury when he saw what he thought was a quarter on the floor and reached down to pick it up. Ward never had a discussion with Petitioner about a small plastic bottle.  Ward noticed that Petitioner had changed clothes when he saw him leaving Finney that afternoon.  Ward testified that one of the mercury screening technicians notified him that Petitioner had positive mercury level readings.  Ward could not reach Petitioner at school, but called him sometime after 7:00 p.m. and asked him to report back to the school.  Petitioner returned to Finney near 11:00 p.m.

Ward testified that he did not remove any videotapes from the security system on October 11, 2001, but a public safety officer informed him that the tapes were missing sometime after 4:00 p.m.  Ward acknowledged that Finney had disruptive incidents such as fighting, graffiti, property damage, and bomb threats, but nothing as serious as a chemical spill.  Ward confirmed that public safety and Actron were responsible for the security cameras and equipment, but explained that Petitioner restored power to the system on two occasions.

Ward was not notified of mechanical or boiler problems that day, but he believed that only one boiler was working.  He testified that problems severe enough to close the school should be reported to him or the assistant principal.  Ward was aware of overtime concerns at Finney, but he operated within his budget.  He testified that Petitioner did not want to comply with new overtime reporting requirements and had written a memo to his supervisor.

David Sawicki, an operations manager for an environmental company called Tetratec, Inc., testified that he reported to Finney between 6:00 and 8:00 p.m. on October 11, 2001 to

12

assist with screening and determine the extent of the spill. Petitioner showed him the mercury

beads in the hallways. He said it was unusual to have the bulk of a spill in hallways with a

limited amount in classrooms. He estimated that a quart of mercury was spilled at the school.

Frank Vaught, the chief engineer of boiling systems for the Detroit Public Schools and

union steward, testified that he received a call from Petitioner at 11:00 a.m. on October 11, 2001.

Petitioner was upset and told him that he was having union issues over pay with his crew and he

was going to shut the school down if Vaught did not respond. Petitioner did not mention

mechanical or boiler problems. Vaught also received a call from Gary Lucy asking him to go to

Finney. Vaught did not get to the school, but he subsequently learned that Finney had been shut

down. Vaught testified that he could not find paperwork reflecting a boiler problem at Finney.

He acknowledged that a blown nipple or faulty safety valve would make a boiler non-

operational. Vaught was aware that Ron Diebel's working out of class at Finney was causing

problems.

Michael Paul, an F.B.I. agent, testified that he interviewed Petitioner and prepared a

report. During that interview, Petitioner said that he gained entry to the cabinet containing the

mercury items by pulling it open. Petitioner also admitted that he took a shower and changed

clothes in the boiler room facility at Finney after the spill and took another shower and washed

his clothes at home. Petitioner provided a written chronology of his activities on October 11,

2001 and a log book for the plant at Finney. Paul also testified that he investigated a call made

to a Detroit Board of Education phone operator in which the caller said that her live-in

boyfriend, a recently fired janitor, was responsible for the mercury spill. Paul spoke to the phone

operator; she did not recognize the names Rob Diebel, Frank Gruenwald, or George Bush.

13

Doug Parker, a special agent with the E.P.A. Criminal Investigation Division, testified that he was the case agent for the mercury spill at Finney.  He said that an investigation of two to three years was not unusual for such a case.  He recalled an interview with Finney security guard Donetta Williams who told him that she observed students walking through the mercury and it was chaotic.  Parker testified that he saw the barometer in Fay Najor's classroom once around the time of the spill.  Parker said that Petitioner declined to be interviewed the day after the spill, but subsequently participated in an interview.  He denied committing the spill.

Darryl Rogers, the director of Environmental Health and Safety for the Detroit Public Schools, testified that he went to Finney after receiving a call about the mercury spill.  He spoke to Petitioner while en route.  Petitioner told him that he discovered the mercury when he was patrolling the hallways and thought he saw a quarter on the floor.  When Rogers arrived at Finney, he and Petitioner walked the halls.  Rogers said the mercury was difficult to see, but Petitioner pointed it out to him.  Rogers observed mercury in a trail underneath the lockers and puddled in front of classroom doors.  He believed it was a health risk.  Rogers also testified that Petitioner left the school at some point, but he had not given him the okay to do so.  He said that it would have been helpful for the chief engineer to stay on site.

B.    Defense Witnesses

Leon Cegers testified that he was the assistant principal at Finney from 1997 to 2001 and served as acting principal during the summer school program.  He was in charge of security and building issues and had a close working relationship with Petiitoner.  Cegers testified that he, Petitioner, and Charles Mitchell were involved in the security system installation at Finney.  He also recalled going into Fay Najor's classroom and finding that there were some cabinets

14

containing chemicals which were not properly secured.  He further testified that vandalism,

bomb threats, and fire alarm pulls were ongoing problems at Finney.

John Jaczkowski, a stationary engineer employed at the Detroit Public Schools

engineering lab, testified that he received a call from Petitioner between 8:00 and 9:00 a.m on

October 11, 2001.  Petitioner reported boiler and staffing problems.  Petitioner said that if he did

not get relief, he would have to shut down the plant.  Jaczkowski testified that a chief engineer

would have authority to shut down the plant, but not the building.  He passed the call to his

supervisor, David Robin.

David Robin, a friend of Petitioner's and a first-class stationary engineer in charge of the

Burner/AC section for the Detroit Public Schools, confirmed that he received a call from

Petitioner around 9:00 a.m. on October 11, 2001.  Petitioner said he was having problems with

his equipment and his staff and he was going to have to shut down the plant.  Robin passed the

call to Frank Vaught.  Robin was aware that Petitioner had two vacancies and said that such a

shortage would cause problems in a facility of Finney's size.  Robin also testified that he was

aware that there were problems with boiler number two at Finney, but was impeached with a

prior statement in which he said he was not aware of such a problem.

Bob Cash testified that he was a boiler operator on Petitioner's crew at Finney in 2001.

He testified that boiler number two at Finney was not working on October 11, 2001 and had not

been working for several weeks, but boiler number one was operational.  He said that boiler

number one had a nipple leak which had been there for a few weeks and needed to be repaired.

He said that pipe fitters could repair the leak on site, and recalled that they were waiting on pipe

fitters that day, but could not recall if they came to the school.  Cash also testified that Ron

15

Diebel was working out of class and that this created a problem for the crew. Cash said that he worked a lot of overtime and that Petitioner assigned overtime fairly. Around 1:00 p.m. on October 11, 2001, Petitioner told Cash and Victoria Williamson to get some duct tape and cautionary tape and informed them of the mercury spill. Cash testified that he could easily see a mercury puddle on the floor in front of one of the science rooms. He saw Petitioner in the area where the mercury was located, but did not see him kick it. Cash said he was on duty from 7:00 a.m. to 3:00 p.m. and was with Petitioner most of the day. He did not see Petitioner with any mercury. Cash was impeached with prior testimony in which he said that he saw Petitioner walking through the mercury. He was also impeached with log book entries which indicated that boiler number two was working in late September and early October, 2001.

Michael Wilson, a district engineer for the Detroit Public Schools and Petitioner's immediate supervisor other than the principal, testified that he was aware of the vacancy and crew problems at Finney. He was appointed to minimize the overtime at Finney and other schools. Wilson testified that Petitioner complained about Rob Diebel working out of class, but it was a personnel assignment to fill a vacancy. Wilson said that he received a call from Petitioner around 3:30 p.m. asking to work overtime because there was a problem at Finney, but Petitioner did not say it was a mercury spill. Wilson did not authorize the overtime because another engineer would be coming on shift. Wilson explained that he spoke to a security person and told him to call him back if they needed Petitioner to stay on site, but no one called him back. If someone had, he would have authorized overtime.

Derrick Duffield testified that he was a program supervisor for the heating plant and building operation section for the Detroit Public Schools in 2001. His office was responsible for

16

approving overtime.  He was aware of two vacancies at Finney.  He said that Petitioner was given a directive which stated that any non-contractual overtime for Petitioner and his staff was to be listed on payroll form 6619 and submitted to his office.  He also acknowledged that the payroll office issued a conflicting directive which told Petitioner to report overtime on the school payroll.  Petitioner sent Duffield a letter requesting guidance.  Duffield told him to continue to use the 6619 form.  He did not think that overtime was being abused at Finney, but overtime was a problem in the district, and they wanted to verify the reasons for overtime.  Duffield admitted that he assumed that the overtime documents were truthful when he approved overtime.  Duffield testified that the rate of pay for overtime work was time and a half, and that the effect of Ron Diebel's assignment was to reduce the overtime at Finney.  Duffield could not recall whether he spoke to Ron Diebel and approved him for overtime on October 11, 2001.

Benjamin Gibson testified that he was employed by the Detroit Board of Education and was a union steward.  He was aware of a dispute at Finney regarding Ron Diebel working out of his classification but with the proper licensing; Frank Gruenwald had filed a grievance about it in April, 2001.  Gibson testified that there was an agreement between Diebel and his boss that Diebel would be allowed to work engineering overtime because he had the proper license, but Gibson was obligated as a union steward to follow the collective bargaining agreement and file the grievance.  Gibson remembered receiving repeated calls from Gruenwald and maybe one from Petitioner, but could not remember whether it was on October 11, 2001.

Donnie Knight testified that he was a supervising engineer for the Detroit Public Schools in 2001 and that Petitioner reported to him.  He knew that Finney had a staffing problem.  He described the process for overtime approval and the use of the 6619 Form.  Knight also indicated

17

that a chief engineer at a school would have the authority to shut a school down for safety reasons. He also testified that if he had been the chief engineer at Finney at the time of the mercury spill, he would have stayed on site until the situation was resolved.

Tyrone Whiteside testified that he was a steam or pipe fitter for the Detroit Public Schools in 2001 and his duties involved repairing pipes for boilers. He had a log book which showed that he was at Finney twice on October 11, 2001. He said that this indicated that he and his coworker went there to check the job, left to get materials, and returned to do the job. They usually went straight to a job at 8:30 or 9:00 a.m. after getting a written or verbal assignment.

Whiteside also testified that he drove his own vehicle for work at that time and was paid mileage. He admitted that he occasionally fudged entries to pad the mileage. He was pretty sure he was at Finney that day, but admitted that he did not have an independent recollection of October 11, 2001 and could not recall whether there was an emergency or leak that day. He said that Petitioner contacted him a few months before trial and they spoke on the phone three or four times. Petitioner gave him some inexpensive calculators and date books, mentioned an offer for extra work, and offered to pull permits for him for other jobs. Whiteside learned of the spill two days after it occurred, but did not recall being at Finney two days beforehand when he heard the news. Whiteside was also interviewed by the F.B.I. a few months before trial.

James Edward Horton, the chief engineer at Butzel Middle School, testified that his base salary as a chief engineer is $52,000 to $57,000 per year and that he earns between a $100,000, and $125,000 with overtime included. Prior to trial, defense counsel moved to admit additional testimony from Horton regarding Ron Diebel's employment history and certain destructive acts that had occurred at Butzel while Diebel was employed there before his transfer to Finney. The

18

trial court refused to allow the testimony finding that such other acts evidence of a witness was barred by the Michigan Rules of Evidence.

Wayne Lord, the new chief engineer at Finney, testified that he spoke with Agent Parker at Finney on April 7, 2004 and removed the barometer from Fay Najor's classroom wall that day.

Richard Lewandowski testified that he is a boiler inspector for the City of Detroit and that he was familiar with the two boilers at Finney in 2001. He said that boiler number two had a safety valve leak at the flange and that he told Petitioner to take the boiler off line in October, 2001. He indicated that such a leak could be repaired on site. Lewandowski testified that he went to Finney several times in September and October, 2001. He explained that if a boiler had a blown nipple, the boiler would be taken out of service immediately to prevent an explosion. Lewandowski was impeached with his prior testimony that he could not recall from memory the condition of the boilers at Finney in October, 2001 because he inspects hundreds of boilers. He agreed that he could not remember. He was not at Finney on October 11, 2001.

Victor Nevin testified that he works in Environmental Health and Safety for the Detroit Public Schools and was called to Finney on October 11, 2001. Petitioner informed him of the mercury spill and pointed out the mercury to him as they walked in the science wing. He observed droplets of mercury all over the floor. Petitioner told him that he had cordoned off the area and shut off the fans, which were appropriate security measures. The remaining work involved professional cleanup. Nevin did not see Petitioner walk through the mercury.

Petitioner testified in his own defense at trial. He said that he was the chief engineer at Finney, had worked for the Detroit Public Schools for 31 years, and had 18 months to retirement

19

at the time of the incident.  He said that he made $140,000 and had eight to ten weeks of vacation time that year.  He acknowledged that Finney had overtime issues and said that he assigned work according to contract.  He indicated that Ron Diebel was not assigned to the midnight shift at Finney in October, 2001 because the midnight shift at Finney only ran from Thanksgiving through March each year.  Petitioner admitted that he had problems with his crew because Diebel was working out of class, but said that it did not affect his own overtime.

Petitioner created a timeline of his actions on the day of the mercury spill for federal authorities.  He testified that he arrived at Finney at 7:00 a.m. and confirmed that Diebel, Bob Cash, and Victoria Williamson worked with him that day.  Bob Cash reported that boiler number one had a blown nipple, a cracked pipe, between the water column and steel drum.  Petitioner told Cash to shut the boiler down.  He then called downtown and the steam fitting department, but no one answered.  Petitioner explained that Finney had a backup boiler, but the safety valves were bad and Inspector Lewandowski had told him to take it out of service.  Ron Diebel informed him that Frank Gruenwald and Jim Miller were out sick, that he had called downtown, and that he was going to work overtime.  When Petitioner reached people downtown, he asked for an engineer but no one was available.  Petitioner told them that Diebel could not work the overtime due to his classification.  Petitioner testified that he wanted Diebel to be promoted and had called the union several times.  Petitioner testified that Diebel was upset when he told him he could not work overtime that day.  According to Petitioner, Diebel slammed the door open, threw his coffee cup, and kicked chairs before returning to his desk.

Petitioner recalled speaking to Tammy Force and telling her that if he did not get some help, he was going to shut the "plant" down.  He denied saying "school."  Petitioner contacted

20

the steam fitters and spoke to Tom Cocking around 9:00 a.m.  Petitioner also contacted the operations department and spoke to John Jaczkowski, Dave Robbin, and Frank Vaught.  He told them that he was having problems with the boilers and his crew and that he would have to shut the plant down if he did not get some help.  Petitioner claimed that he did not have authority to shut down the school, and would have had to consult with administrators.

Petitioner also testified about the overtime situation at Finney, explaining that they worked contractual overtime as well as overtime caused by staffing shortages.  He recalled that he received conflicted memos from payroll and Derrick Duffield about how overtime should be reported and had asked for clarification.  He followed Duffield's procedure.

Petitioner met with two steam fitters around 10:00 a.m.  They left and came back to finish the job, and boiler number one was repaired by 11:30 a.m.  Petitioner reviewed the repair and restarted the boiler.  Petitioner made an entry in the log book, but did not have any paperwork.  He had lunch at noon.  His only remaining problem that day was the overtime issue.  Petitioner said that he refused to allow Diebel to work overtime that day because it would violate the contract and create problems with his crew.  After lunch, he checked on two rooms, 128 and 129, that had overheated that morning.  He then made afternoon rounds.  He made sure the fans in the fan room were running and entered the science wing.  He saw something shiny on the floor that he thought was a quarter.  When he bent down to pick it up, he saw that it was mercury.  He went to the office and notified Dr. Johnson, the assistant principal.  Petitioner, Dr. Johnson, and Ms. King then walked down the hallway and he pointed out small beads of mercury in the middle of the hall.  He used his flashlight to highlight the mercury.  Dr. Johnson then returned to the office to make an announcement to hold classes, but the bell rang and students walked

21

through the mercury.  Petitioner and Ms. King attempted to stop them, but it was chaotic.  At

some point, Vic Nevin arrived and they went into Fay Najor's classroom where they saw small

beads of mercury on the counter in her prep room.  During a conversation with Najor, she told

him that the mercury beads on the counter were from the summer, not the current incident.

Petitioner recalled meeting Mr. Sauve that summer and opening the cabinet for him so that he

could retrieve the mercury-laden items from the school.  Petitioner denied using a wire or

screwdriver to open the cabinet and instead testified that he just pushed on it and pulled it open.

Petitioner also testified that part of his job was to maintain the power to the security

system.  He knew where all the cameras were located.  Petitioner admitted that Mr. Ward

instructed him to stay out of the security console.  Petitioner denied being near the security

console on October 11, 2001.  He also denied being near rooms 153-156 and said that he was not

in that hallway until 11:00 p.m. that evening.

Petitioner testified that after they found the mercury, he went to the boiler room around

1:30 p.m. to get caution tape.  He enlisted Bob Cash and Victoria Williamson to help him.  He

saw Rob Diebel sitting at his desk and asked him why he was still there since he was scheduled

to go home at noon.  Diebel said he was working overtime and Petitioner told him to go home.

Petitioner and the others then went upstairs to cordon off the hallway.  Petitioner also called Dr.

Rodgers, who arrived at 2:00 p.m.  Vic Nevins arrived at 2:30 or 3:00 p.m.  Petitioner showed

them the mercury spill.  Petitioner denied kicking the mercury or joking about it.  Additional

security, police, firefighters, and E.P.A. personnel also came to the school.

Petitioner called Mike Wilson and asked if he should stay for the afternoon shift.  Wilson

told him that another engineer was scheduled at 4:00 p.m. and did not approve overtime.

22

Petitioner had his clothes and shoes tested for mercury.  His left shoe came back positive but the tester wanted to re-calibrate or re-charge his equipment.  Petitioner then went to the boiler room, took a shower, and changed clothes and shoes.  He put his clothes and shoes in plastic bags and put them in his truck.  He went home around 4:30 p.m., showered, shampooed his hair, shaved, and washed his clothes.  He returned to Finney around 5:30 p.m., then went out to dinner with his girlfriend.  Dr. Ward paged him and Petitioner returned to Finney at 11:00 p.m.  At that time, they tested the boiler room for mercury, as well as Petitioner's shoes, which were negative. Petitioner spoke with a police detective and Agent Parker, then left Finney at 1:00 am. and went home.

Petitioner admitted that he called several people following the incident, including Victoria Williamson, Ron Diebel, Fay Najor, and Tammy Force.  He called Williamson and Diebel to talk about their work shifts, called Najor to talk about the barometer, and called Force to inquire about her contact with police.  Petitioner denied accidentally or intentionally spilling mercury at Finney.

On cross-examination, Petitioner stated that he was wearing a knee brace on October 11, 2001 due to a surgery.  He said that he experienced some pain but he was able to work without restrictions.  Petitioner acknowledged that he had his own heating and cooling business which he operated while working at Finney.  He admitted that he gave promotional items from that business to Tyrone Whiteside.  He denied taking security tapes from Finney.

The jury found Petitioner guilty of the charged offense.  The trial court sentenced him to five years probation and over $76,000 in restitution.

Petitioner filed an appeal of right with the Michigan Court of Appeals, raising the same

23

claims presented on habeas review.  The court affirmed his conviction.  *See People v. Bush*, No. 260635, 2006 WL 2956282 (Mich. Ct. App. Oct. 17, 2006) (unpublished).  Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order.  *People v. Bush*, 477 Mich. 1057, 728 N.W.2d 440 (2007).

Petitioner filed this petition raising the following claims:  (1) the prosecution presented insufficient evidence to support his conviction, (2) the trial court violated his constitutional rights by refusing to grant a mistrial after improper testimony and giving an insufficient curative instruction, (3) the trial court denied him the right to present a defense when it refused to allow testimony about other prior acts allegedly committed by an alternate suspect, and (4) the trial court denied him the right to confront witnesses by refusing to allow him to cross-examine a witness about her mental health history.

## III.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified 28 U.S.C. § 2241 *et seq.*, governs this case because Petitioner filed his habeas petition after the AEDPA's effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

24

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, _ U.S. _, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court recently held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, _ S. Ct. _, 2011 WL 148587, *11 (Jan. 19, 2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The

25

Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* ( citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, _ U.S. _, _, 129 S. Ct. 1411, 1419 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, slip op. at *10. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

26

While the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Lastly, a state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

**IV.     Discussion**

        **A.     Sufficiency of the Evidence**

Petitioner first asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence to support his conviction. He claims that the prosecution failed to present sufficient evidence that he ever possessed mercury, or that he was the person who released the mercury at the school.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court established that a federal court's review of a sufficiency of the evidence claim must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. The court must view this standard through the framework of 28 U.S.C. § 2254(d). *See Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Thus, under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review – the factfinder at trial and the state

court on appellate review – as long as those determinations are reasonable.  *See Brown v.*

*Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), *cert. den.* _ U.S. _, 130 S. Ct. 1081 (2010).

Furthermore, the *Jackson* standard must be applied "with explicit reference to the substantive

elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16.  "The

mere existence of sufficient evidence to convict therefore defeats a petitioner's claim."

*Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003) (citation omitted).

> The Michigan Court of Appeals set forth the relevant state law as follows:
>
> MCL 750.200i provides, in pertinent part:
>
> (1) A person shall not manufacture, deliver, possess, transport, place, use, or release any of the following for an unlawful purpose;
> ***
>     (b) A harmful chemical substance . . . .
>
> MCL 750.200h(e)(I) defines "[f]or an unlawful purpose" as, among other things, "having the intent to . . . [f]righten, . . . intimidate, threaten, [or] harass."

*People v. Bush*, No. 260635, 2006 WL 2956282, *1 (Mich. Ct. App. Oct. 17, 2006)

(unpublished).  Essentially, the prosecution had to prove that Petitioner released mercury, a

harmful chemical substance, and intended to frighten, intimidate, threaten, or harass.  Under

Michigan law, circumstantial evidence and reasonable inferences arising from the evidence may

constitute satisfactory proof of the elements of an offense, *see People v. Jolly*, 442 Mich. 458,

466, 502 N.W.2d 177 (1993), including a defendant's intent or state of mind.  *See People v.*

*Dumas*, 454 Mich. 390, 398, 563 N.W.2d 31 (1997).

> Applying these standards, the Michigan Court of Appeals decided that the prosecution

presented sufficient evidence to support Petitioner's conviction.  The court explained:

> Viewed in the light most favorable to the prosecution, the evidence indicated that defendant was upset that Ronald Diebel, a high pressure boiler operator, was

28

assigned to his crew to work as an engineer. Defendant believed that, although Diebel was licensed as a third-class engineer, this was a violation of the collective bargaining agreement. Defendant was further upset when, on October 11, 2001, Diebel was authorized to work overtime as an engineer. On October 11, 2001, defendant made several telephone calls threatening to close either the school or the plant if his boiler problems and personnel issues were not quickly resolved. This evidence was sufficient to support an inference that defendant had a motive to release the mercury because he was upset that the boiler and personnel issues were not resolved to his satisfaction.

The evidence also indicated that defendant had access to a supply of mercury before the spill. The school engaged in an effort to rid itself of mercury in July 2001. Supplies of mercury were collected and stored in a locked cabinet, awaiting disposal. There was evidence that defendant knew where the mercury was stored and how to open the cabinet without a key. Further, a barometer that had been listed in the mercury inventory was missing and, contrary to what defendant asserts, this was not the same barometer that remained in a classroom until 2004.

At approximately 12:55 p.m. on October 11, 2001, a large spill of mercury was discovered in the school's science wing. Defendant was at lunch or inspecting the fan rooms immediately before the spill, and a jury could have found that he had the opportunity to release the mercury. The jury also reasonably could have determined that the spill was intentional, given the magnitude, spill pattern, and locations of the spills. There was also evidence that defendant seemed to know the locations of the spills throughout the hallway, even though the lighting was poor and others did not immediately notice mercury in the locations identified by defendant. Defendant was also observed kicking the mercury and playing with it, and did not seem to take its health dangers seriously. There was evidence that defendant's clothing or shoes tested positive for mercury shortly after the spill, and that defendant subsequently laundered his clothes. Also, defendant showered twice shortly after the spill. The evidence concerning the nature of the spill, defendant's familiarity with the locations of the spills, and defendant's conduct in response to the spill, viewed in a light most favorable to the prosecution, was sufficient to support an inference that defendant intentionally released the mercury in the school.

In the days following the spill, defendant called several people to find out what they had told the police or to influence what they would say if contacted by the police. This evidence supported an inference that defendant was attempting to eliminate himself as a suspect responsible for the spill. The school's security tapes were also discovered missing after the spill, and the evidence indicated that defendant was familiar with the security system and knew where the cameras were located. The foregoing evidence, cumulatively considered and viewed in

29

the light most favorable to the prosecution, was sufficient to support defendant's conviction beyond a reasonable doubt.

*Bush*, 2006 WL 2956282 at *1-2.

This decision is neither contrary to *Jackson* nor an unreasonable application of federal law or the facts. Although the evidence against Petitioner was circumstantial, taken together it was sufficient to support Petitioner's conviction. *See, e.g., Britt v. Howes*, No. 09-1597, 2010 WL 5135618, *3 (6th Cir. Dec. 16, 2010) (unpublished) (confirming that circumstantial evidence alone is sufficient to sustain a conviction and denying habeas relief); *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (direct appeal case). The prosecution's evidence showed that Petitioner and his crew did not like the fact that Ron Diebel, while properly licensed, was working outside his payroll classification due to a delay in promotion. Petitioner had a large facility to operate, which required overtime work. He was upset about not getting his personnel and equipment problems resolved promptly. Frank Vaught testified that Petitioner was very upset when he spoke to him shortly before the spill. Tammy Force testified that Petitioner threatened to close the school if someone did not address his concerns.

The prosecution also showed that Petitioner had access to mercury. In fact, Petitioner admitted that he had access to the locked cabinet containing mercury. A large barometer was missing from the cabinet when the inventoried items were removed from the school in July, 2001. A jury could have inferred from the large quantity of mercury in the hallways and the spill pattern shown in photographs and described by witnesses, that the spill was intentional. Petitioner was alone in the area around the time of the spill. He discovered the mercury, which some witnesses said was hard to see, and some witnesses said he kicked and/or walked through the mercury.

30

Petitioner's behavior after the spill could also be viewed as suspicious.  He showered and changed his clothes twice, left the school while the crisis was ongoing, and laundered his clothes at home.  He also contacted several witnesses to ask about their contact with police and their versions of events.  Based upon these facts and inferences, a reasonable jury could have concluded that Petitioner was responsible for the mercury spill and that he acted with the requisite intent.

Petitioner testified on his own behalf at trial and presented several witnesses who contradicted portions of the prosecution's case.  Petitioner claims that such evidence created a reasonable doubt at trial, essentially challenging the credibility and weight to be accorded the evidence presented at trial.  It is well-settled, however, that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Jackson*, 443 U.S. at 326.  It is the job of the fact-finder, not a federal habeas court, to resolve credibility conflicts.  *See Martin*, 280 F.3d at 618; *Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983).  This Court on habeas review cannot re-weigh the evidence or reassess witness credibility.

Lastly, to the extent Petitioner challenges the state court's construction or application of state law, he is not entitled to relief.  "A claim that the state court misunderstood the substantive requirements of state law does not present a claim under § 2254.  A federal court may not issue the writ on the basis of a perceived error of state law."  *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  Given the trial testimony, the Court finds that the state court's decision

31

that a rational trier of fact could find the essential elements of the charged offense beyond a reasonable doubt was reasonable.  Habeas relief is not warranted.

**B.      Denial of Mistrial**

Petitioner next asserts that he is entitled to habeas relief because the trial court erred in denying his motion for a mistrial.  During trial, two witnesses testified about a small plastic bottle and dropper.  James Hoelscher testified that he received the bottle and the dropper from Agent Doug Parker and then described how he packaged the items and sent them to the lab for testing.  John Fowler testified that a chemical analysis had been performed on the bottle and dropper, and that the bottle tested positive for mercury.  On cross-examination, Dr. Fowler admitted that he had neither performed nor observed the tests, and that the person who conducted the testing was unavailable due to a medical condition.  Petitioner objected and requested a mistrial.  The trial court ruled that Fowler's testimony about the test results was inadmissible hearsay; it twice instructed the jury to disregard the testimony, but denied the motion for mistrial.  In giving the initial instruction, the judge stated that Agent Parker received the bottle from Petitioner.  In re-instructing the jury on this issue before deliberations, the judge did not link the bottle to Petitioner.

Petitioner claims that his confrontation rights were violated by the hearsay testimony because he was unable to cross-examine the actual tester and asserts that the trial court's cautionary instructions were improper and insufficient to cure the error.  He maintains that the trial court should have granted his request for a mistrial.  Respondent contends that this claim lacks merit and/or is barred by procedural default.

It is well-settled that alleged trial court errors in the application of state evidentiary law

32

are generally not cognizable as grounds for federal habeas relief.  *See Estelle v. McGuire*, 502

U.S. 62, 67-68 (1991); *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1354 (6th Cir.

1993).  Only when an evidentiary ruling is "so egregious that it results in a denial of

fundamental fairness," may it violate due process and warrant federal habeas relief.  *See Bugh v.

Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see also Clemmons v. Sowders*, 34 F.3d 352, 356

(6th Cir. 1994).  Furthermore, a trial court has the discretion to grant or deny a motion for

mistrial in the absence of a showing of manifest necessity.  *See Arizona v. Washinton*, 434 U.S.

497, 506-510 (1978) (mistrial due to deadlocked jury); *Walls v. Konteh*, 490 F.3d 432, 436 (6th

Cir. 2007); *Clemmons v. Sowders*, 34 F.3d 352, 354-55 (6th Cir. 1994).  The Supreme Court

recently confirmed the significant deference due a trial court's decision to grant or deny a

mistrial.  *See Renico*, 130 S. Ct. at 1863–64 (reversing grant of habeas relief on claim contesting

state trial court's grant of a mistrial due to a deadlocked jury).

>    The Michigan Court of Appeals denied relief on this claim:
>
>    Jurors are presumed to follow the trial court's instructions. *People v. Graves*, 458
>    Mich 476, 486; 581 NW2d 229 (1998). In this case, there is no basis for
>    concluding that the jurors ignored the trial court's instructions to disregard the
>    testimony about the bottle. On the contrary, in opposition to defendant's motion
>    for a new trial, the prosecutor submitted the affidavit of the jury foreperson, who
>    averred that the jury followed the court's instruction not to consider Fowler's
>    testimony, and that the testimony was not considered in reaching a verdict.
>    Defendant did not present any contrary evidence. And, we are not persuaded that
>    Fowler's testimony was so damaging that it was incapable of being cured by the
>    court's cautionary instructions. The trial court instructed the parties, outside the
>    jury's presence, not to make any further references to the bottle, and no evidence
>    was ever presented linking the bottle to defendant. Under the circumstances, the
>    trial court did not abuse its discretion in denying defendant's motion for a
>    mistrial, or in denying defendant's motion for a new trial based on this issue.FN2
>
>    FN2. At oral argument, defense counsel raised for the first time, a concern about
>    information extended to the jury by the trial court itself during curative
>    instructions to the jury regarding mercury testing on a bottle. This issue was not

33

> raised in defendant's brief on appeal. Nonetheless, we have reviewed the record
> and found no error. Defendant affirmatively expressed satisfaction with the jury
> instructions. An expression of satisfaction with respect to a trial court's jury
> instruction effects waiver of the issue. Once waived, there is no issue to review.
> *People v. Carter*, 462 Mich 206, 214, 219; 612 NW2d 144 (2000).

*Bush*, 2006 WL 2956282 at *3.

This decision is neither contrary to Supreme Court precedent nor an unreasonable

application thereof. As an initial matter, the Court notes that there was no confrontation

violation because the trial court excluded the hearsay testimony and instructed the jurors to

disregard it. *See, e.g., United States v. Moore*, 240 F. App'x 699, 710 (6th Cir. 2007)

(indicating that no confrontation error occurs when the disputed testimony is not admitted into

evidence); *Thomas v. Wolfenbarger*, No. 06-CV-15465-DT, 2008 WL 1766682, *10 (E.D.

Mich. April 15, 2008) (same). Jurors are presumed to follow the trial court's instructions. *See*

*United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors . . . take an oath to follow the law as

charged, and they are expected to follow it."). Additionally, the Court finds that the trial court

acted within its discretion in denying Petitioner's motion for a mistrial and instead opting to (1)

require that the parties make no further mention of the matter and (2) instruct the jury that the

testimony was inadmissible and must be disregarded. Such decisions by the trial court are

entitled to deference, particularly on habeas review. Petitioner has also not shown that he was

prejudiced by the trial court's actions. As noted by the Michigan Court of Appeals, the jury

foreperson indicated that the jurors did not consider the inadmissible testimony during

deliberations.

Petitioner fails to establish a violation of his constitutional rights. Habeas relief is not

warranted.

34

C.      Jury Instruction

Petitioner says that he is entitled to habeas relief because the trial court initially

erroneously instructed the jury that Agent Parker received the bottle and dropper from

Petitioner.  The Court's re-instruction did not link Petitioner to these items.  The Court

concludes that Petitioner's jury instruction challenge is barred by procedural default.

Federal habeas relief may be precluded on claims that a petitioner has not presented to

the state courts in accordance with the state's procedural rules.  *See Wainwright v. Sykes*, 433

U.S. 72, 85-87 (1977).  The doctrine of procedural default is applicable when a petitioner fails

to comply with a state procedural rule, the rule is actually relied upon by the state courts, and

the procedural rule is "adequate and independent."  *White v. Mitchell*, 431 F.3d 517, 524 (6th

Cir. 2006); *see also Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Coleman v.

Mitchell,* 244 F.3d 533, 539 (6th Cir. 2001).  "A procedural default does not bar consideration

of a federal claim on either direct or habeas review unless the last state court rendering a

judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural

bar."  *Harris v. Reed*, 489 U.S. 255, 263-64 (1989).  The last *explained* state court judgment

should be used to make this determination.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).

If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing

court relied upon the last reasoned opinion.  *Id*.

Here, the Michigan Court of Appeals rendered the last reasoned opinion.  In denying

relief on this particular claim, the court relied upon a state procedural bar – Petitioner's

acceptance of the jury instructions as given – which the court found to constitute a waiver of

this issue.  *See Bush*, 2006 WL 2956282 at *3 n. 2.  The failure to make a contemporaneous

35

objection or request is a recognized and firmly-established independent and adequate state law ground for refusing to review trial errors.  *See People v. Carines*, 460 Mich. 750, 763, 597 N.W.2d 130 (1999); *People v. Stanaway*, 446 Mich. 643, 687, 521 N.W.2d 557 (1994); *see also Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991).  In this case, the Michigan Court of Appeals denied relief based on Petitioner's acceptance of the jury instructions, *i.e.,* his failure to object to those instructions at trial.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 753; *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).  Petitioner neither alleges nor establishes cause to excuse this procedural default.  A federal habeas court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default.  *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).  Petitioner has also not shown that a fundamental miscarriage of justice occurred.  The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent.  *See Schlup v. Delo,* 513 U.S. 298, 326-27 (1995).  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 624 (1998).  "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  *Schlup*, 513 U.S. at 324.  Petitioner makes no such showing.  This claim is barred by procedural

36

default.

### D.      Right to Present a Defense

Petitioner asserts that he is entitled to habeas relief because the trial court refused to admit evidence of third-party guilt.  Petitioner sought to admit testimony from James Horton regarding acts of vandalism which occurred at Butzel Middle School when Ron Diebel was employed there.  The trial court excluded the testimony, finding that such other acts evidence was barred by the Michigan Rules of Evidence.  *See* Mich. R. Evid. 403, 404(a)(4); *see also* Mich. R. Evid. 607, 608, 609.  Petitioner asserts that this ruling deprived him of the right to present a defense.  Respondent contends that this claim lacks merit.

The right of an accused to present a defense has long been recognized as "a fundamental element of due process."  *Washington v. State*, 388 U.S. 14, 19 (1967).  However, "a defendant's right to present evidence is not unlimited, but rather is subject to reasonable restrictions."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  A defendant "does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Montana v. Egelhoff,* 518 U.S. 37, 42 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)).  State rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  *Scheffer,* 523 U.S. at  308 (internal citations omitted).

"A defendant's interest in presenting . . . evidence may thus bow to accommodate other legitimate interests in the criminal trial process."  *Id.* (internal quotations omitted).  The Supreme Court explained that judges have latitude to exclude evidence:

37

> [W]ell-established rules of evidence permit trial judges to exclude evidence if its
> probative value is outweighed by certain other factors such as unfair prejudice,
> confusion of the issues, or potential to mislead the jury . . . . [T]he Constitution
> permits judges 'to exclude evidence that is 'repetitive . . . only marginally
> relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the
> issues.'

*Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) (citations omitted).  In determining

whether the exclusion of evidence infringes upon a defendant's rights, the question is not

whether the excluded evidence would have caused the jury to reach a different result.  Rather,

the question is whether the defendant was afforded "a meaningful opportunity to present a

complete defense."  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v.

Trombetta*, 467 U.S. 479, 485 (1984)); *see also Chambers v. Mississippi*, 410 U.S. 284, 302

(1973).

The Michigan Court of Appeals denied relief, finding that the evidence was plainly

inadmissible under Michigan Rule of Evidence 404(a).  The court also found that Petitioner was

not denied the right to present a defense under *Chambers, supra*.  The court explained:

> In the present case, there is no claim that Diebel confessed to this crime.
> Additionally, defendant was not denied the opportunity to cross-examine Diebel,
> to test his recollection, or to present noncharacter evidence to attempt to show
> that Diebel may have committed the crime. Unlike in Chambers, defendant never
> offered evidence that Diebel released the mercury, he was merely seeking to
> introduce evidence of Diebel's alleged past misconduct to show that he may have
> acted accordingly on this occasion, contrary to MRE 404(a). Defendant was not
> deprived of a fair opportunity to defend himself by the mechanistic application
> of the rules of evidence. Thus, the trial court did not abuse its discretion in
> excluding the evidence of Diebel's alleged prior misconduct.

*Bush*, 2006 WL 2956282 at *4.

This decision is neither contrary to Supreme Court precedent nor an unreasonable

application of the law or the facts.  The record reveals that Petitioner was able to sufficiently

38

question witnesses about the events at Finney and to inquire into whether anyone else, including Ron Diebel, had the motive, opportunity, and means to commit the crime. While evidence that tends to prove a person other than the defendant committed a crime is relevant, there must be some connection between the other alleged perpetrator and the crime, not mere speculation by the accused. *See, e.g., DiBenedetto v. Hall*, 272 F.3d 1, 8 (1st Cir. 2001). In this case, the proposed testimony from James Horton was inadmissible under state law as other acts evidence of a witness. Moreover, the proposed testimony was speculative and did not establish that Ron Diebel actually committed destructive acts at Butzel. More importantly, the testimony did not implicate Diebel in the mercury spill at Finney.

Petitioner fails to establish that he was denied his right to present a defense or that the trial court's evidentiary ruling rendered his trial fundamentally unfair. Habeas relief is not warranted.

### E.    Confrontation Rights

Lastly, Petitioner asserts that he is entitled to habeas relief because he was denied his confrontation rights when the trial court limited his cross-examination of prosecution witness Victoria Williamson. The trial court refused to allow such questioning, finding it to be an improper attack on her credibility. Petitioner claims that he should have been allowed to cross-examine Williamson about her mental health history as it related to her ability to perceive or relate events.

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to confront the witnesses against him. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S.

39

308, 315 (1973).  "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.  Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness's story to test the witness's perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit the witness."  *Id.* at 314.

The right of cross-examination, however, is not absolute.  "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. VanArsdall*, 475 U.S. 673, 679 (1986); *see also Norris v. Schotten*, 146 F.3d 314, 329-30 (6th Cir. 1998).  Additionally, while the right of an accused to present a defense is fundamental to due process, it is well-established that a defendant's right to present evidence is not unlimited and may be subject to reasonable restrictions, so long as the defendant is afforded a meaningful opportunity to present a complete defense.  *See* discussion *supra*.

Petitioner claims that his ability to present a defense and to confront Williamson about her mental health history was violated by the trial court's ruling because her testimony undermined the defense in two respects.  First, Williamson provided an alibi for the defense's alternate suspect, Ron Diebel, because she testified that she was in the break room studying with Diebel from 12:00 to 1:00 p.m.  Second, Williamson contradicted defense testimony that both of Finney's boilers were having problems on the day of the mercury spill.  Petitioner states that Williamson took a leave of absence for psychiatric treatment and contends that he should

40

have been able to challenge "her credibility to observe, to assimilate what was occurring in front of her, and [to determine] if she was suffering from paranoia or schizophrenia."

The Michigan Court of Appeals denied relief and upheld the trial court's decision to exclude the testimony. The court ruled that Petitioner failed to show how Williamson's alleged mental health problems meant that she was biased against him or that she would testify falsely. The court found that Petitioner's proposed line of questioning was an improper attack on her general credibility. The court further found that Petitioner failed to make even a minimal showing that Williamson suffered from mental illness which would have affected her ability to perceive and recall events and concluded that Petitioner's confrontation rights were not violated. *Bush*, 2006 WL 2956282 at *4-5.

This decision is neither contrary to, nor an unreasonable application of, Supreme Court precedent. Petitioner has not presented evidence that Williamson suffered from paranoia or schizophrenia near the time of the incident or that she experienced any mental illness which would have impaired her ability to perceive or recall events. Petitioner only asserted that Williamson had taken a leave of absence at some point in time for unspecified psychiatric reasons. Consequently, the Court agrees that the proposed line of questioning was an attempt to challenge her general credibility – an action which is afforded no constitutional protection. Moreover, Petitioner was sufficiently able to question Williamson about her observations and actions on the day of the mercury spill and to explore her motivations and any possible bias.

Petitioner fails to show that the state court's evidentiary ruling violated his confrontation rights, impeded his ability to present a substantial defense, or rendered his trial fundamentally unfair. Habeas relief is not warranted.

41

V.        **Conclusion**

For the reasons stated, the Court concludes that Petitioner is not entitled to federal

habeas relief on the claims contained in his petition.  Accordingly, the Court **DENIES WITH**

**PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability

("COA") must issue.  *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A COA may issue

"only if the applicant has made a substantial showing of the denial of a constitutional right."  28

U.S.C. § 2253(c)(2).  When a court denies relief on the merits, the substantial showing

threshold is met if the petitioner demonstrates that reasonable jurists would find the court's

assessment of the constitutional claim debatable or wrong.  *See Slack v. McDaniel*, 529 U.S.

473, 484-85 (2000).  "A petitioner satisfies this standard by demonstrating that . . . jurists could

conclude the issues presented are adequate to deserve encouragement to proceed further."

*Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A court may not conduct a full merits review,

but must limit its examination to a threshold inquiry into the underlying merit of the claims.  *Id*.

at 336-37.

While the Court believes that Petitioner is not entitled to habeas relief, the Court

nonetheless finds that he makes a substantial showing of the denial of a constitutional right on

all of his claims; his claims present constitutional issues worthy of appellate review.  Therefore,

the Court **GRANTS** a certificate of appealability.

**IT IS ORDERED.**


                                    S/Victoria A. Roberts
                                    Victoria A. Roberts
Dated:  February 8, 2011            United States District Judge

42

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on February 8, 2011.

s/Carol A. Pinegar
Deputy Clerk